UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| AMALIA SMITH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:15-CV-68-SPM ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) ) |

## **MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the application of Plaintiff Amalia Smith ("Plaintiff")[1] for Disabled Adult Child and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 9). Because I find the decision denying benefits was not supported by substantial evidence, I will reverse the Commissioner's denial of Plaintiff's application and remand for further proceedings.

---

[1] Although the plaintiff in this case is named Amalia Smith, the administrative record describes an individual named William Edward Rodgers Massey, whose diagnoses included gender identity disorder. It appears from the record that Plaintiff's name was changed at some point after the decision of the Commissioner and before the filing of the instant complaint.

## I. PROCEDURAL BACKGROUND

On or around February 13, 2012, Plaintiff applied for Disabled Adult Child benefits and SSI, alleging that she had been unable to work since August 23, 2010. (Tr. 221, 223, 236). Plaintiff's applications were denied initially. (Tr. 145-46, 148-58). Plaintiff filed a request for hearing by an administrative law judge (ALJ). (Tr. 159). After a hearing, the ALJ found that Plaintiff was not under a disability as defined in the Act. (Tr. 13-27). On March 26, 2015, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II. FACTUAL BACKGROUND[2]

### A. Plaintiff's Statements and Testimony

In a Function Report completed in February 2012, Plaintiff reported living in a trailer behind her parents' house. (Tr. 266). Plaintiff reported caring for a cat; doing laundry, cleaning, and yard work; drawing; writing books; playing video games; and sometimes reading. Plaintiff reported difficulty with memory completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 267-68, 271).

On December 10, 2013, Plaintiff testified at a hearing before the ALJ. (Tr. 103-34). At the time, she was living in a residential care facility. (Tr. 105). She testified that in August 2012, she was hospitalized for fourteen days, and her parents would not allow her to return home. (Tr. 105). She stayed in a homeless shelter four three months, then returned to the hospital because she became suicidal, and then got into the residential care facility. (Tr. 106). She looked for some work while she was living at the homeless shelter, but she did not have any luck; she also held off looking for a job because of the disability hearing coming up. (Tr. 108-09). She has a high school

---

[2] The following is not intended to be an exhaustive summary of the administrative record. The Court focuses, as do the parties, on the records most relevant to Plaintiff's arguments.

education and thought about going to college, but her adoptive mother discouraged her from going. (Tr. 110-11).

Plaintiff testified that she generally gets along with others, that she "can do just about anything in the house" such as cooking, laundry, and dishes, (Tr. 115); that she can go shopping, (Tr. 117-18); and that she enjoys playing videogames, drawing, writing, and hanging out with friends, (Tr. 119). She testified that she gets depressed a lot and does not want to get out of bed or do anything. (Tr. 122). She testified that her depression and anxiety would prevent her from working because if she was in a bad or upsetting mood, she would not be very productive at work and could be late, could not show up, or could snap at her boss. (Tr. 126). She also testified that she does not deal with stress well and will sometimes hold it in and then "explode on" someone. (Tr. 127). She also testified that she gets claustrophobia and anxiety when crowded around a lot of people, or when she has a lot of things on her mind. (Tr. 127-28).

### B. Medical Records

Treatment records from February 2010 to June 2011 show that Plaintiff was diagnosed with Tourette's syndrome, attention deficit hyperactivity disorder, seasonal pattern depression, and mild recurrent major depression, and that she received several medications for these conditions (Tr. 318-41).

Plaintiff's high school records from February 2012 show that Plaintiff had a grade point average of 3.16 on a 4.0 scale and was in regular education classes with no special instruction. (Tr. 347). Plaintiff's teacher completed a questionnaire indicating that she missed school often for illness; that Plaintiff had no problems acquiring and using information or attending and completing tasks; and that she had "a slight problem" (2 on a scale of 1 to 5) in several areas of interacting and relating with others, including playing cooperatively with other children, making and keeping friends, seeking attention appropriately, and relating experiences and telling stories. (Tr. 349-52).

On April 4, 2012, Plaintiff underwent a consultative psychological evaluation by Dr. John O. Wood, Psy. D. (Tr. 374-76). Plaintiff reported some problems with depression and anxiety, distractibility, sustaining attention, and maintaining concentration. (Tr. 374). Plaintiff reported exhibiting odd motor movements. (Tr. 374). Plaintiff reported generally eating meals with parents, spending time at home studying for school, helping with household chores, reading books, playing video games, writing poems and stories, and hanging out with friends at school. (Tr. 375). Dr. Wood found that Plaintiff's eye contact was fair, that Plaintiff spoke at times in a somewhat soft and unassured manner, that Plaintiff's mood and affect were generally appropriate and congruent, and that Plaintiff was cooperative and agreeable during the examination. (Tr. 375). Dr. Wood performed some testing and found some deficits in delayed recall and attention. (Tr. 375). Dr. Wood assessed attention deficit hyperactivity disorder (by history), Tourette's disorder (by history), and depressive disorder. (Tr. 375). He assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65, indicating mild symptoms.[3] (Tr. 376). He found that Plaintiff was capable of understanding and remembering simple instructions and that when on medication, Plaintiff's ability to maintain attention and concentration on simple tasks was adequate. (Tr. 376).

In early August 2012, Plaintiff was hospitalized for approximately two weeks for depression with some vague suicidal ideations. (Tr. 384). Plaintiff reported difficulty with being made fun of at school. (Tr. 388). Plaintiff reported that she had not been taking medications as prescribed due to an inability to pay for them. (Tr. 389). Plaintiff's mood and affect improved as the course of the

---

[3] The Global Assessment of Functioning ("GAF") scale is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

hospitalization progressed, with a GAF score at admission of 31 and a GAF score at discharge of 55.[4] (Tr. 384). At discharge, Plaintiff's mother refused to take her back, and a social worker found Plaintiff a place at a shelter. (Tr. 386).

On August 23, 2012, Plaintiff underwent a psychiatric evaluation by Courtney Johnson, M.D. Dr. Johnson reviewed Plaintiff's medical and social history and noted a history of depressive symptoms and at least one suicide attempt. (Tr. 412). She noted that Plaintiff's depressive symptoms resolved once she stopped living with her adoptive parents. (Tr. 412). Dr. Johnson stated that "[a]lthough it appears that the patient may have met criteria for major depressive disorder, the fact that his depressive symptoms are associated with external stressor and quickly remitted in the presence of that particular stressor being removed is concerning for adjustment disorder, with mixed anxiety and depressed mood." (Tr. 412). She noted that a history of fighting, difficulty paying attention, and problems with memory was concerning for ADHD, which should be further evaluated. (Tr. 412). She assigned a GAF score of 41-50[5] and continued Plaintiff's medications. (Tr. 413-14).

On October 21, 2012, Plaintiff was admitted to the hospital with depression and suicidal thoughts. (Tr. 426). Plaintiff reported that she had not been taking medications due to an inability to afford them, but it was noted that she was now on Medicaid. (Tr. 432). Plaintiff reported that when

---

[4] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* 32. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

[5] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

the people at the Amen Center (the shelter where Plaintiff was living) found out about her sexual orientation, "it got bad," and Plaintiff became suicidal. (Tr. 426, 432). Plaintiff reported contemplating suicide every day. (Tr. 432). Plaintiff's medications were adjusted. (Tr. 433). Plaintiff's GAF was 35 upon admission and was 55 at discharge five days later. (Tr. 432). Plaintiff was found a place at the Lou Masterman Residential Care Facility. (Tr. 434).

Between approximately October 25, 2012, and at least December 10, 2013, Plaintiff lived at the residential care facility. (Tr. 434-35, 105). Medical records during this period show that Plaintiff complained of symptoms including depression or low mood, (Tr. 397, 476, 480, 484, 485); a chronic intermittent passive death wish, (Tr. 468, 476); gender identity issues, (Tr. 397, 418, 420, 468, 488); anxiety, (Tr. 418); and poor distress tolerance, (Tr. 420, 421, 479). Plaintiff's diagnoses included depressive disorder, r/o panic disorder without agoraphobia; Asperger's Syndrome; gender identity disorder; borderline personality disorder; a history of Tourette's Disorder; a history of ADHD; and a history of pervasive developmental disorder. (Tr. 418, 421, 467, 468, 472, 474, 475, 478, 479, 482, 483, 484, 487). Plaintiff's treating psychiatrist assigned GAF scores of 50 in late 2012, (Tr. 418-22); and GAF scores of "51-60" or "61-70" in 2013, (Tr. 471, 476, 479, 480, 484, 485, 487, 488, 491).

On December 4, 2012, Plaintiff underwent a psychological assessment by Georgette Johnson, Psy. D. (Tr. 450-463). Plaintiff's mental status examination was generally normal, other than fidgeting and motor restlessness, bland affect, and moderately impaired memory for remote events. (Tr. 457). Dr. Georgette Johnson diagnosed depressive disorder, history of major depression—recurrent—severe, rule out bipolar II disorder; generalized anxiety disorder with panic disorder features; ADHD, rule out impulse control disorder; and history of Asperger's disorder, and she assigned a GAF of 60. (Tr. 462). She also noted that "[i]t might be of benefit for [Plaintiff] to enroll in a Vocational Education/Rehabilitation program." (Tr. 454).

On December 3, 2013, Plaintiff's treating psychiatrist, Dr. Courtney Johnson, completed a medical source statement. Dr. Courtney Johnson reported that she saw Plaintiff every two to three months and that Plaintiff had gender identity disorder, depressive disorder, and borderline personality disorder. Plaintiff's GAF score was 60, and her highest GAF score for the past year was 61-70. Dr. Johnson indicated that Plaintiff's symptoms were mood disturbance and suicidal ideation or attempts. (Tr. 574). Dr. Johnson stated that Plaintiff had a history of poor distress tolerance and suicidal thoughts. (Tr. 575). She stated that Plaintiff's condition had significantly responded to, and/or improved with, medications or other treatment modalities; and that she believed the severity of symptoms was reduced, in part due to the structured and supporting living arrangement currently provided by the Lou Masterson Center. She did not answer the question, "Do you believe that there would be a resulting increase in symptom severity and/or decline in functioning should [Plaintiff] no longer reside in a sheltered, structured setting such as the Lou Masterson Center." (Tr. 575). She indicated that Plaintiff's impairments and symptoms would cause her to be absent from work about three times per month. (Tr. 576). She found that Plaintiff had a moderate impairment (defined as a 17-32% degree of limitation in job-related functioning during a typical 8-hour work day) in the ability to deal with work stressors, and mild impairments in the ability to relate to coworkers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention and concentration. (Tr. 576). She found that Plaintiff had no impairment in the ability to understand, remember and carry out simple or detailed, but not complex, job instructions. (Tr. 577). She found that Plaintiff had mild impairment in the ability to understand, remember, and carry out complex job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (Tr. 577). She found no restriction in activities of daily living; no difficulties in maintaining functioning; mild deficiencies of concentration, persistence, or pace,

resulting in a failure to complete tasks in a timely manner; and mild impairment in episodes of deterioration decompensation in work or work-like settings. (Tr. 578).

### III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether [he or she] would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B). To establish entitlement to disabled adult child benefits, a Plaintiff must prove he or she is 18 years of age or older and suffers from a disability that began before she reached 22 years of age. *See* 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5). Disability is determined using the adult disability standard. 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step

Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, he or she is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given

the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

### IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since August 23, 2010, the alleged onset date, and that Plaintiff had the severe impairments of depressive disorder, asthma, attention deficit hyperactivity disorder, gender identity disorder, borderline personality disorder, history of Tourette's syndrome, history of Asperger's syndrome, and obesity. (Tr. 18). The ALJ then found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 ("the Listings"). (Tr. 18-19). The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b); was limited to never climbing ladders, ropes, or scaffolds and no operation of a motor vehicle; must avoid moderate exposure to pulmonary irritants; must avoid all exposure to unprotected heights, dangerous unprotected machinery, and extreme cold, heat, and humidity; was limited to work that does not involve sampling or tasting of foods or beverages so as not to interfere with recommended diet; and was limited to performing tasks and instructions with an Specific Vocational Preparation level of 2[6] or less involving only occasional interaction with the general public away from crowds, in a reduced stress work environment defined as having to make occasional commensurate decisions and no more than occasional changes in routine in a normal work setting. (Tr. 20). The ALJ found that Plaintiff had no past relevant work. (Tr. 25). However,

---

[6] The SVP ("specific vocational preparation") level for a particular job is the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, App'x. C, 1991 WL 688702. A job with an SVP of 2 takes no more than one month to learn. *Id.*

relying on the testimony of a vocational expert, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (Tr. 25). The ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, from August 23, 2010, through the date of his decision. (Tr. 26).

## V. DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds: (1) that the ALJ failed to consider the effects of a structured setting on Plaintiff's RFC; and (2) that the ALJ failed to properly consider Plaintiff's RFC in light of the opinion of treating psychiatrist Dr. Johnson.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ Adequately Considered the Effects of a Structured Setting on Plaintiff's RFC

Plaintiff's first argument is that the ALJ failed to consider the effects of the fact that Plaintiff was living in a structured setting and to assess Plaintiff's ability to function outside that setting in determining her RFC. As Plaintiff points out, 20 C.F.R. Part 404, Subpart P, Appendix 1, provides that the ALJ must consider the effects of such settings:

> F. Effects of structured settings. Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.

After review of the record, the Court finds that the ALJ did adequately consider Plaintiff's ability to function outside of the residential care facility setting. First, in assessing whether Plaintiff met or equaled a listed impairment and in assessing Plaintiff's RFC, the ALJ expressly recognized that Plaintiff resided in a residential care facility, and his decision indicates that he considered the effects of that in his decision. (Tr. 19, 22). After noting that Plaintiff reported no difficulty taking care of personal needs or performing household chores, the ALJ stated, "Given that [Plaintiff] currently resides in a residential care facility working towards the goal of independent living, the undersigned finds that [Plaintiff] has moderate limitations in activities of daily living." (Tr. 19). The fact that the ALJ found a "moderate restriction," despite noting that Plaintiff had no difficulties in this area, indicates that the ALJ was considering the impact of Plaintiff's residence in a structured setting on Plaintiff's ability to function. This interpretation is also consistent with the fact that the ALJ found that Plaintiff had moderate difficulties in social functioning and included in the RFC limitations on Plaintiff's ability to interact with the general public and with crowds, despite

the fact that the ALJ gave significant weight to the opinion of Dr. Courtney Johnson that Plaintiff had "no impairment" in activities of daily living and had only "mild" impairments in social functioning and in the ability to deal with the public. (Tr. 19-20, 25, 577).

Second, much of the evidence the ALJ relied on in assessing Plaintiff's RFC was dated *outside* the period when Plaintiff was living in the residential care facility. For example, the ALJ gave "significant weight" to the opinion of consultative examiner Dr. Wood, who in April 2012 (several months before Plaintiff entered the residential care facility) assigned Plaintiff a GAF score of 65, indicating only mild limitations, and who found that Plaintiff was capable of understanding and remembering simple instructions and had an adequate ability to maintain attention and concentration on simple tasks. (Tr. 25, 376). The ALJ also considered that in February 2012 (also several months before Plaintiff entered the residential care facility), Plaintiff's school records showed that she was functioning well at school, with a GPA of 3.16, and was not involved in special education services. (Tr. 23, Tr. 347). Other school records from that time also indicate that Plaintiff had no more than slight problems in a few areas of interpersonal interaction. (Tr. 349-52).

It is also significant that Plaintiff points to no evidence showing that her functional limitations would increase if she were not in a structured setting such as the residential care facility. When Plaintiff's treating physician was presented with that question on an opinion form, she left blank the space provided for an answer. (Tr. 575).

In sum, although the ALJ's discussion could perhaps have been more explicit, it is clear that the ALJ adequately discharged his duty to consider Plaintiff's ability to function outside of a highly structured environment. *Cf. Johnson ex rel. A.J. v. Astrue*, No. 11 Civ.5247(JMF), 2013 WL 1187436 at *15 (S.D.N.Y. Mar. 22, 2013) ("Although an ALJ is required by regulation to consider the factors related to functioning in a supportive and structured setting, that 'regulation does not

command the ALJ to *explicitly* discuss his consideration.'") (internal citations and quotation marks omitted).

### C. Remand Is Required for the ALJ to Reconsider the Opinion of Dr. Courtney Johnson

Plaintiff's second argument is that the ALJ failed to properly assess Plaintiff's RFC because the ALJ failed to fully evaluate the opinion of Plaintiff's treating physician, Dr. Courtney Johnson. The Court agrees in part and finds that remand is required.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ may discount a treating physician's opinion if it is inconsistent with the physician's treatment notes or with the record as a whole. *See Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010). However, "[w]hen an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

Here, Plaintiff's treating psychiatrist, Dr. Courtney Johnson, noted that Plaintiff had a history of poor distress tolerance and a history of suicidal thoughts associated with external stressors. (Tr. 575). She opined that Plaintiff's impairments and symptoms would cause absences from work about three times per month. (Tr. 576). She further opined that Plaintiff had moderate

impairments in the ability to deal with work stressors and mild impairments in many other areas of mental work-related functioning. (Tr. 576-78). The ALJ gave "significant weight" to this opinion, finding that Dr. Johnson's opinions were corroborated by her treatment records showing GAF scores ranging from 51 to 70. (Tr. 25).

In large part, the RFC assigned by the ALJ is consistent with the opinion of Dr. Johnson. The ALJ included a limitation to a reduced-stress work environment involving only occasional decisions and no more than occasional changes in routine, which reflects the moderate limitation on ability to deal with work stressors in Dr. Johnson's opinion. The ALJ also included a limitation to tasks and instructions with an SVP of 2 or less and tasks involving only occasional interaction with the general public, away from crowds, which address Dr. Johnson's opinion that Plaintiff had mild limitations in some other areas. However, the ALJ did not include in the RFC any limitation reflecting Dr. Johnson's opinion that Plaintiff would miss (on average) three days of work per month due to her impairments. The omission of this limitation from the RFC was significant, because the vocational expert testified at the hearing before the ALJ that an individual who missed even two days per month would be terminated from the jobs the vocational expert had identified. (Tr. 139).

It appears from the decision that the ALJ discounted Dr. Johnson's opinion that Plaintiff's symptoms would cause her to miss work three times per month due to her impairments. However, he gave no reasons for his decision to do so. Moreover, after review of the ALJ's decision and the record as a whole, it is not obvious to the Court why the ALJ discounted this particular limitation. The other medical opinions relied on by the ALJ do not appear to expressly address the question of absences from work. The Court has not found, and the Commissioner has not cited, any medical treatment records or other records that specifically address the question of how often, if at all, Plaintiff's symptoms would likely cause her to miss work. The Court also notes that Plaintiff's

school records from February 2012 indicate that Plaintiff had an unusual degree of absenteeism and missed school often for illness, a finding that tends to support Dr. Johnson's opinion. (Tr. 349).

The Court takes no position about whether the ALJ should credit or discount Dr. Johnson's opinion regarding Plaintiff's absences from work, and recognizes that a hearing decision need not always specifically discuss every single issue the ALJ considered. However, in this instance, and with respect to this particular limitation, the ALJ needed to be explicit. This limitation is included in the opinion of the treating psychiatrist, which was given "significant weight," and is a limitation that, if fully credited, may have changed the outcome of the case. The ALJ's failure to explicitly address whether he considered and discounted the opinion regarding plaintiff's absences from work and, if he discounted it, why he discounted it, prevents this Court from being able to assess whether his decision is supported by substantial evidence. The Court will therefore remand this case for a re-evaluation of this aspect of Dr. Courtney Johnson's opinion. *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); *Clover v. Astrue*, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) (remanding where the ALJ did not provide reasons for discrediting a treating physician).

The Court will briefly address Plaintiff's other arguments. Plaintiff argues that the ALJ erred by giving "significant weight" to Dr. Johnson's opinion that Plaintiff had a moderate impairment (defined as a 17% to 32% degree of limitation in in job-related functioning during a typical eight-hour work day) in the ability to deal with work stressors, without asking the vocational expert whether an individual who would be off-task for 17% to 32% of the day would be able to maintain employment. Plaintiff argues that this omission affected the outcome of the case because in Plaintiff's counsel's experience, vocational experts agree that an employee cannot maintain employment if he or she is off-task for more than 15% of an eight-hour workday. This

argument is without merit. Dr. Johnson did not specifically opine that Plaintiff would be off-task or unable to perform work for a particular percentage of the day; instead, she opined that Plaintiff would have a limitation in her ability to deal with work stressors. The ALJ accommodated Plaintiff's limited ability to deal with work stressors by limiting her to a reduced-stress work environment in which she would make only occasional commensurate decisions and have no more than occasional changes in work routine. In addition, the Court notes that Plaintiff's counsel's experience about what vocational experts believe is not evidence that this Court may consider.

Plaintiff also argues that the ALJ did not consider whether Dr. Johnson's opinions regarding Plaintiff's limitations were applicable only to Plaintiff's ability to function within the structured setting of the Lou Masterman Residential Care Facility. This is essentially the same argument as was made in Plaintiff's first point, and it is without merit for the reasons discussed above.

In sum, although the Court finds that several of Plaintiff's arguments are without merit, the Court finds that remand is required for the ALJ to reconsider the opinion of Plaintiff's treating psychiatrist that Plaintiff's symptoms and limitations would likely cause her to be absent from work three times or more per month.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of September, 2016.